**Keisha HUNT**

v.

**McNEIL CONSUMER HEALTHCARE, et al.**

**Civil Action No. 11–457.**

United States District Court, E.D. Louisiana.

Signed March 11, 2014.

Patty Ann Trantham, Robert Lyle Salim, Salim–Beasley, LLC, Natchitoches, LA, Jay Hodges Henderson, Jay Henderson, PLLC, Joseph C. Melugin, Kenneth Thomas Fibich, Russell S. Briggs, Fibich, Hampton, Leebron, Briggs & Josephson, LLP, Sara J. Fendia, Law Offices of Sara J. Fendia, Houston, TX, Val Patrick Exnicios, Liska, Exnicios & Nungesser, New Orleans, LA, for Keisha Hunt.

James B. Irwin, Douglas J. Moore, Kelly E. Brilleaux, Timothy Farrow Daniels, Irwin Fritchie Urquhart & Moore, LLC, New Orleans, LA, Charles Coleman Lifland, O'Melveny & Myers, LLP, Los Angeles, CA, Kari L. Sutherland, Paul Victor Cassisa, Jr., Butler, Snow, O'Mara, Stevens & Cannada, Oxford, MS, Kenneth P. Conour, Preuss, Shanagher, Zvoleff & Zimmer, Matthew P. Smith, Vernon I. Zvoleff, Drinker, Biddle & Reath, LLP, San Francisco, CA, for McNeil Consumer Healthcare, et al.

## ORDER AND REASONS

JANE TRICHE MILAZZO, District Judge.

Defendants have raised the affirmative defense of preemption. The question presented is whether Plaintiff's product liability claims are preempted by federal law. For the following reasons, the Court finds Defendants have failed to carry their burden of demonstrating preemption.

### BACKGROUND

This a pharmaceutical products liability action. Plaintiff Keisha Hunt suffered personal injury on February 4, 2010 after ingesting Children's Motrin—a non-prescription drug manufactured by Defendants McNeil Consumer Healthcare[1]

---

1. Defendant's full name is listed on the docket as "McNeil Consumer Healthcare, a Division of McNeil–PPC, Inc."

("McNeil") and Johnson & Johnson. The active ingredient in Children's Motrin is ibuprofen. Plaintiff alleges Children's Motrin caused her to contract Stevens–Johnson Syndrome and/or Toxic Epidermal Necrolysis ("SJS/TEN").[2] Plaintiff subsequently filed suit under the Louisiana Products Liability Act("LPLA"), La.Rev. Stat. § 9:2800.54 *et seq.*, alleging Children's Motrin is defectively designed and contains inadequate warnings of potential health problems. Defendants answered the complaint and asserted the affirmative defense of federal preemption, on which they carry the burden of proof. *See Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir.2012) ("Federal preemption is an affirmative defense that a defendant must plead and prove.").

## LEGAL STANDARD

■ The doctrine of preemption derives from the Supremacy Clause, which provides that federal law "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Accordingly, "state laws that conflict with federal law are 'without effect.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)).

■ Whether state law is preempted by federal law *vel non* is a question of congressional intent. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 494, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case.") (internal quotation

marks omitted). Congress may manifest preemptive intent in three ways. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).[3] "Express preemption" occurs when a federal law contains an express preemption clause. *See Altria Grp.*, 555 U.S. at 76, 129 S.Ct. 538. "Field preemption" occurs when a federal regulatory scheme is so pervasive or a federal interest so dominant that Courts may presume Congress intended to occupy the legislative field exclusively. *English*, 496 U.S. at 72, 110 S.Ct. 2270. Finally, "conflict preemption" occurs when state law conflicts with a federal statute. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). The Supreme Court recognizes two separate, albeit interrelated, forms of conflict preemption. *See id.* at 372–73, 120 S.Ct. 2288. Courts will find "impossibility preemption" where "it is impossible for a private party to comply with both state and federal law." *See id.* at 372, 120 S.Ct. 2288. "Obstacles preemption," on the other hand, occurs "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English*, 496 U.S. at 79, 110 S.Ct. 2270 (internal quotation marks omitted).

■ In undertaking the preemption analysis—whether express, field, or conflict—courts must heed "the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Grp.*, 555 U.S. at 77, 129 S.Ct. 538 (alteration in original) (internal quotation marks

---

**2.** SJS/TEN is a rare but life-threatening disease that causes severe blistering and consequent sloughing off of skin over much of the body, together with serious damage to the mouth, eyes, throat, and esophagus. *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 864 (7th Cir.2010).

**3.** The three different categories of federal preemption are not "rigidly distinct" and often overlap. *See English*, 496 U.S. at 79 n. 5, 110 S.Ct. 2270.

omitted). This assumption applies with "particular force" when Congress legislates in a field traditionally occupied by the States. *Id.*

## LAW AND ANALYSIS

Defendants contend Plaintiff's LPLA claims that Children's Motrin is defectively designed and contains inadequate warnings are preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.* Specifically, Defendants invoke the doctrine of impossibility preemption, arguing that it was impossible to comply with both state-law duties under the LPLA *and* federal duties imposed by the FDCA. The Court addresses each of Plaintiff's LPLA claims separately.[4]

### I. *Whether Plaintiff's Inadequate–Warning Claim Is Preempted by Federal Law*

■ Defendants contend the Supreme Court's decision in *Wyeth v. Levine*, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009), preempts Plaintiff's inadequate-warning claim under the LPLA. As explained more fully below, the Court disagrees for two reasons. First, *Wyeth* is inapposite. Second, even if *Wyeth* is on point, Defendants fail to provide "clear evidence," as required by *Wyeth*, that it was impossible to comply with both the LPLA and the FDCA.

*Wyeth* involved the brand-name prescription drug Phenergan—an antihistamine administered intravenously by the "IV-push" method or the "IV-drip" method. 555 U.S. at 559, 129 S.Ct. 1187. The IV-push method presented a higher risk of the drug entering an artery, thereby causing gangrene. *Id.* at 559–61, 129 S.Ct. 1187. The plaintiff received an IV-push injection of Phenergan and developed gangrene in her right arm, which was eventually amputated at the forearm. *Id.* at 559, 129 S.Ct. 1187. The plaintiff brought a products liability action against the manufacturer of Phenergan, alleging the drug label failed to adequately warn of the dangers associated with the IV-push method. *See id.* at 560, 129 S.Ct. 1187. The manufacturer argued both forms of conflict preemption—that is, "impossibility preemption" and "obstacles preemption." *Id.* at 563–64, 129 S.Ct. 1187. The Supreme Court rejected both.

In addressing the first, the Court began by noting the general rule that a manufacturer may not alter a drug label absent the Food and Drug Administration's ("FDA") approval of a supplemental application. *Id.* at 568, 129 S.Ct. 1187. There is, however, a "changes being effected" ("CBE") regulation that allows manufacturers to supplement a drug label *immediately* upon filing a supplemental application, *i.e.*, without first receiving FDA approval. *Id.* The Court interpreted the FDCA and its complementing regulations (such as the CBE) to require that manufacturers ensure drug warnings "remain adequate as long as the drug is on the market." *Id.* at 571, 129 S.Ct. 1187. Thus, when the risk of gangrene from an IV-push injection became apparent, the manufacturer had a duty to update its warning absent "clear evidence" the FDA would not have ultimately approved such a warning. *Id.* Because the manufacturer in *Wyeth* failed to offer clear evidence the FDA would have rejected the proposed change, the Court concluded that

---

**4.** Defendants also argue that to the extent Plaintiff asserts a so-called "fraud-on-the-FDA claim," that claim is preempted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). Plaintiff has since clarified that she does not assert such a claim. Indeed, as Plaintiff correctly notes, the LPLA provides the exclusive remedy against manufacturers for damage caused by their products and therefore precludes any cause of action for fraud-on-the-FDA. *See Castle v. Danek Med., Inc.*, No. 96–2485, 1999 WL 1129649, at *2 (W.D.La. Oct. 5, 1999).

it was not impossible for the manufacturer to comply with both federal and state-law requirements. *Id.* at 572–73, 129 S.Ct. 1187.

Defendants contend *Wyeth* preempts Plaintiff's inadequate-warning claim because there is "clear evidence" the FDA would not have approved Plaintiff's proposed changes to the Children's Motrin label. But this argument erroneously presupposes its legal predicate—that *Wyeth* is on point. There is a crucial distinction between *Wyeth* and the case at bar: whereas *Wyeth* involved a prescription drug, Children's Motrin is available over the counter.[5]

Non-prescription drugs are regulated by a special statute—21 U.S.C. § 379r. While this statute contains an explicit preemption clause, 21 U.S.C. § 379r(a), it also contains a savings clause, which "expressly preserve[s] product liability actions." *Wyeth*, 555 U.S. at 575 n. 8, 129 S.Ct. 1187; *see also Mut. Pharm. Co. v. Bartlett*, —— U.S. ——, 133 S.Ct. 2466, 2480, 186 L.Ed.2d 607 (2013). The savings clause— entitled "No effect on product liability law"—provides as follows: "Nothing in [21 U.S.C. § 379r] shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State." 21 U.S.C. § 379r(e). Congress' intent to preserve state-law product liability actions with respect to non-prescription drugs could not be more clear. This conclusion is underscored by the axiom that courts should assume Congress did not intend to displace state law, especially when Congress legislates in a field traditionally regulated by the states such as health and safety. *See PLIVA, Inc. v. Mensing*, —— U.S. ——, 131 S.Ct. 2567, 2586, 180 L.Ed.2d 580 (2011) (Sotomayor, J., dissenting). Given

that Congressional intent is the "ultimate touchstone" in any preemption analysis, *Altria Grp.*, 555 U.S. at 76, 129 S.Ct. 538 (internal quotation marks omitted), and that "[i]mpossibility preemption is a demanding defense," *Wyeth*, 555 U.S. at 573, 129 S.Ct. 1187, the Court cannot find Plaintiff's inadequate-warning claim preempted.

Even assuming *arguendo* that Wyeth is on point, Defendants' preemption argument still fails. As *Wyeth* makes clear, an inadequate warning claim is only preempted when a defendant adduces "*clear evidence* that the FDA would not have approved a change to [the drug's] label" that was necessary to comply with state law. 555 U.S. at 571, 129 S.Ct. 1187 (emphasis added). Defendants contend there is clear evidence the FDA would have rejected the Plaintiff's proposed changes to the Children's Motrin label. In support of this argument, Defendants cite (1) the FDA's response to a 2005 citizen petition, and (2) the FDA's statement in an August 1, 2013 letter addressed to McNeil. As explained more fully below, neither constitutes the kind of "clear evidence" necessary to establish preemption under *Wyeth*.

A. *Whether the FDA's Response to a 2005 Citizen Petition Constitutes "Clear Evidence"*

██ On February 15, 2005, a group of citizens (including several doctors) petitioned the FDA (the "Citizen Petition") to conduct a full risk assessment of SJS/TEN associated with ibuprofen, and to require manufacturers of prescription and non-prescription ibuprofen to amply their warning labels. The Citizen Petition requested the FDA to require the following warning label on nonprescription ibuprofen products like Children's Motrin:

---

**5.** As explained more fully below, unlike the statute governing non-prescription drugs, the statute which regulates prescription drugs does not contain a savings clause. *See* 21 U.S.C. § 355.

**Warnings (to follow "Allergy alert")**

**Serious Skin Reactions:** Ibuprofen may cause serious skin reactions that begin as rashes and blisters on the skin, and in the areas of the eyes, mouth and genitalia. These early symptoms may progress to more serious and potentially life-threatening diseases, including Erythema Multiforme, Stevens Johnson Syndrome and Toxic Epidermal Necrolysis. Seek immediate medical attention if any of these symptoms develop while taking ibuprofen.

**Stop use and ask a doctor if:**

● a skin rash or blisters on the eyes, mouth or genitalia occur because these symptoms may be an early sign of rare and life-threatening reactions including Erythema Multiforme, Stevens Johnson Syndrome and Toxic Epidermal Necrolysis.

The FDA responded to the Citizen Petition on June 22, 2006. With respect to the labeling of nonprescription ibuprofen products, the FDA stated:

We agree that the labeling for OTC NSAIDs, including all ibuprofen products, should be improved to warn consumers about the risks of severe skin reactions associated with OTC ibuprofen products. As a result, we have requested that manufacturers include under the Allergy alert subheading the symptoms associated specifically with SJS and TEN. *We do not believe that it is useful to include the specific terms SJS, TEN, or erythema multiforme, Stevens–Johnson syndrome, and toxic epidermal necrolysis in the OTC label because most consumers are unfamiliar with these terms. In addition, effective OTC labeling communicates warning information in a manner that consumers can quickly and easily identify and understand. Consequently, we believe that a description of symptoms is more appropriate, Therefore, prominently displayed under the Allergy alert subheading in the Drug Facts Label, the labeling will include:*

● skin reddening
● rash
● blisters

In addition, under the *Allergy alert* subheading, the labeling will state: "If an allergic reaction occurs, stop use and seek medical help right away." We believe that adding these symptoms to the *Allergy alert,* with advice to stop use and seek medical attention immediately, will alert and educate consumers to the nature of the allergic reactions associated with SJS and TEN.

Defendants' argument that this response constitutes "clear evidence" the FDA would have rejected the stronger warnings proposed by Plaintiff fails for two distinct reasons. *See generally Newman v. McNeil Consumer Healthcare,* No. 10–CV–1541, 2012 WL 39793, at *6–11 (N.D.Ill. Jan. 9, 2012). First, the FDA did not specifically reject the warnings Plaintiff claims are required. If Plaintiff's only complaint was that the warning label on Children's Motrin should have included the terms "Stevens–Johnson Syndrome" and "Toxic Epidermal Necrolysis," the Court would be more inclined to find that Defendants have presented "clear evidence" the FDA would not have approved a CBE incorporating those terms. *See Robinson,* 615 F.3d at 873 (suggesting FDA's response to Citizen Petition provides clear evidence that agency would not require specific references to SJS/TEN on warning labels for non-prescription ibuprofen).[6]

---

**6.** At least one court has questioned whether the FDA's response to a citizen petition requesting label changes can *ever* constitute "clear evidence" under *Wyeth. See Dorsett v. Sandoz, Inc.,* 699 F.Supp.2d 1142, 1157 (C.D.Cal.2010) (finding that the FDA's rejection of certain citizen petitions only "consti-

But Plaintiff's complaint goes much further, specifically alleging the label on Children's Motrin should have warned of "massive skin loss or sloughing of skin; blindness or eye injuries; burns over large portions of the body; massive scarring; damage to bodily organs; extensive external or internal injuries; severe and permanent disability; transient and/or permanent mucosal injuries, including injuries to the genitalia; recurrent and/or irreversible damage to hair and nails; and potential long-term dental injures or deformities." The FDA did not clearly reject *any* of these warnings. *See Newman,* 2012 WL 39793, at *7 ("[T]hose phrases that are the most similar to Plaintiffs' warnings were not suggested by the petitioners [in the Citizens Petition] as individual, discrete elements; that the phrases were not included in the FDA's warning is not necessarily a rejection of those particular phrases."). At least three other courts have held that the FDA's response to the Citizen Petition does not constitute clear evidence the FDA would reject warnings for Children's Motrin similar to those proposed by Plaintiff. *See id.* at *6–8; *Wolfe v. McNeil– PPC, Inc.,* 773 F.Supp.2d 561, 568–69 (E.D.Pa.2011); *Lofton v. McNeil Consumer & Specialty Pharm.,* 682 F.Supp.2d 662, 677–78 (N.D.Tex.2010).

Second, the FDA's response in 2006 to the Citizen Petition is not clear evidence the agency would have rejected *in 2010* the stronger warnings Plaintiff proposes. *See Newman,* 2012 WL 39793, at *9–11; *accord Mason v. SmithKline Beecham Corp.,* 596 F.3d 387, 395 (7th Cir.2010). As the Supreme Court explained in *Wyeth,* manufacturers are required by federal law to update their labels in response to "newly acquired information," which encompasses both new data and new analyses of

old data. 555 U.S. at 568–69, 129 S.Ct. 1187 (internal quotation marks omitted); *Newman,* 2012 WL 39793, at *9. When the FDA responded to the Citizen Petition, it noted that a search of the U.S. adverse event report database ("AER") retrieved only forty-nine reports of SJS/TEN cases related to ibuprofen. Of those forty-nine cases, only thirteen reported the use of non-prescription ibuprofen. The FDA ultimately concluded the risk of SJS/TEN associated with the use of ibuprofen was not nearly as high as that asserted in the Citizen Petition. Subsequent to the FDA's 2006 response, however, Defendants have received over one-hundred AERs regarding ibuprofen-related SJS/TEN cases. *See id.* at *9. At least fifty-one of those reports were received between the time the FDA responded to the Citizen Petition and February 4, 2010—the date on which Plaintiff ingested Children's Motrin. "This newly acquired information yields the conclusion that even if there was clear evidence that the FDA would not have approved a change to the Motrin labels at some point in the past, such evidence is no longer sufficiently obvious for preemption purposes." *Id.* at *11.

B. *Whether the FDA's August 2013 Letter Constitutes Clear Evidence*

 On August 1, 2013, the FDA responded to a CBE supplemental request from McNeil regarding Tylenol. The letter stated that the FDA had recently become aware of the risk of SJS/TEN among users of non-prescription products containing acetaminophen. In order to address those risks, the FDA ordered manufacturers of acetaminophen to supplement their warning labels. As Defendants note, the new warnings are substantially similar to

tuted determinations that the warnings should not be *mandated;* they were not determinations that manufacturers could not choose to

add warnings that they believed were scientifically substantiated.") (emphasis in original).

those ordered by the FDA in response to the Citizen Petition. According to Defendants, because the FDA was aware in 2013 of new data suggesting a link between acetaminophen and SJS/TEN yet failed to require stricter warnings than those ordered in 2006, it follows that the warnings that appeared on Children's Motrin in 2010 are the only warnings the FDA deems appropriate. The Court disagrees.

Acetaminophen is not ibuprofen. Defendants offer no evidence as to chemical similarity between the two drugs, the comparative safety profile of acetaminophen, the nature, number, and extent of acetaminophen-related AERs, and the specific factors considered by the FDA in ordering stronger warnings. Moreover, the FDA's August 1, 2013 letter was not written in response to a citizen petition. Defendants essentially compare apples with oranges.

## II. Whether Plaintiff's Design–Defect Claim Is Preempted by Federal Law

■ Defendants contend Plaintiff's design-defect claim must be dismissed as preempted under *Mutual Pharmaceutical Co. v. Bartlett.* The Court disagrees, because *Bartlett*—like *Wyeth*—does not apply to non-prescription drugs. Before addressing the preemptive effect (or lack thereof) of *Bartlett* on this case, the Court first discusses *PLIVA, Inc. v. Mensing,* an earlier Supreme Court decision on which *Bartlett* heavily relies.

The plaintiffs in *Mensing* sustained injury after ingesting generic metoclopramide and alleged that the manufacturers were liable in tort for failing to provide adequate warning labels. 131 S.Ct. at 2573. The question presented was "whether federal drug regulations applicable to generic drug manufacturers directly conflict with, and thus pre-empt, these state-law claims." *Id.* at 2572. In answering this question,

the Court distinguished between the legal regimes governing brand-name and generic drug manufacturers. Whereas brand-name manufacturers can change their warning labels without first seeking FDA approval,[7] generic manufacturers are governed by a "duty of sameness," which requires their labels to mirror the corresponding brand-name labels at all times. *Id.* at 2574–78. The Court ultimately found impossibility preemption, because it was impossible for the generic manufacturers "to comply with both their state-law duty to change the label and their federal law duty to keep the label the same." *Id.* at 2578.

*Bartlett* extended *Mensing* in ways not yet clear. The plaintiff in *Bartlett* took a generic form of sulindac, after which she developed an acute case of toxic epidermal necrosis (the affliction with which Plaintiff herein suffers). 133 S.Ct. at 2471–72. The plaintiff sued the generic manufacturer in New Hampshire, asserting, *inter alia,* a design-defect claim. *Id.* at 2472. The Supreme Court ultimately held that the design-defect claim was preempted by federal law. *Id.* at 2471.

The Court began by identifying the relevant duties under state law. The Court explained that New Hampshire law requires manufacturers to ensure their products are not "unreasonably dangerous." *Id.* A manufacturer complies with this duty either by changing the drug's composition or by strengthening its labeling. *Id.* The Court found that redesign was unavailable for two reasons. First, generic drugs must have the same active ingredients, route of administration, dosage form, strength, and labeling as their brand-name counterpart. *Id.* at 2475. Moreover, manufacturers in general—whether generic or brand-name—are prohibited from

---

7. As explained *supra, Wyeth* established that brand-name manufacturers can—and indeed must—use the CBE process to update their labels.

making any major changes to the drug's composition without FDA approval. *Id.* at 2472, 2475. Second, sulindac is a one-molecule drug incapable of being redesigned. *Id.* at 2475. Thus, the only way for the manufacturer to comply with its state-law duties was to strengthen the drug's warning label. *Id.* Citing *Mensing,* the Court explained that federal law prohibits manufacturers from unilaterally altering the warning label for a generic drug. *Id.* at 2476. Thus, the Court held "that state-law design-defect claims that turn on the adequacy of a drug's warnings are pre-empted by federal law under [*Mensing* ]."

The scope of the *Bartlett* holding has been the subject of much debate among lower courts.[8] Some courts read *Bartlett* narrowly to apply only to generic drugs. *See, e.g., Estate of Cassel v. Alza Corp.,* No. 12–771, 2014 WL 856023 (W.D.Wis. Mar. 5, 2014); *Dopson–Troutt v. Novartis Pharm. Corp.,* No. 06–1708, 975 F.Supp.2d 1209, 2013 WL 5330463 (M.D.Fla. Sept. 23, 2013). Others disagree, finding that *Bartlett* preempts design-defect claims against brand-name manufacturers as well. *See, e.g., Thompson v. Allergan USA, Inc.,* No.

4:13CV00030 AGF, 993 F.Supp.2d 1007, 2014 WL 308794 (E.D.Mo. Jan. 28, 2014).[9] But no court has addressed whether *Bartlett* (and its predecessor *Mensing* ) apply to manufacturers of non-prescription drugs such as the Defendants in this matter. Both cases suggest, however, that non-prescription drugs should be treated differently.

In a footnote at the beginning of its preemption analysis, the *Mensing* Court noted that the regulations governing generic drugs contain neither an express preemption clause nor a saving clause. 131 S.Ct. at 2577 n. 5. This statement implies the Court's analysis would have been different had Congress specifically addressed preemption in the relevant legislation.

Unlike the Court in *Mensing,* the *Bartlett* Court expressly stated that the presence of a preemption or savings clause would have influenced its analysis. The Court lamented the fact that Congress had not expressly addressed "the difficult preemption questions that arise in the prescription drug context." *Bartlett,* 133 S.Ct. at 2480. It noted that Congress had "explicit[ly]" addressed preemption in other drug laws, specifically identifying the

---

**8.** One issue is whether *Bartlett* only applies to design-defect claims that require the manufacturer to alter a drug's warning, or whether *Bartlett* also preempts claims that the manufacturer was required to alter a drug's composition. There is language in the opinion which appears to support both interpretations. *Compare Bartlett,* 133 S.Ct. at 2470 ("We hold that state-law design-defect claims that turn on the adequacy of a drug's warnings are pre-empted by federal law under PLIVA."), *with id.* at 2479 ("[W]e hold that state-law design-defect claims like New Hampshire's that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling."). If the latter interpretation is correct, it would effectively foreclose *all* design-defect claims, since manufacturers

are prohibited from unilaterally altering a drug's composition. *See Estate of Cassel,* 2014 WL 856023 at *5. Whether the *Bartlett* Court intended to articulate such a far-reaching doctrine of preemption is a question for another day. This Court need not resolve the issue, since *Bartlett* is distinguishable from the case at bar for a different reason, as explained more fully below.

**9.** These courts tend to focus on the following excerpt from *Bartlett:* "Once a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.'" 133 S.Ct. at 2471 (quoting 21 C.F.R. § 314.70(b)(2)(i)).

"express non-preemption clause" for non-prescription drugs. *Id.* "In the absence of that sort of 'explicit' expression of congressional intent, we are left to divine Congress' will from the duties the statute imposes." *Id.* It seems clear, then, that the Court did not intend *Bartlett* to apply to circumstances in which Congress has explicitly addressed preemption.[10] Because the statute governing non-prescription drugs contains a non-preemption clause, Plaintiff's design-defect claim is not preempted under *Bartlett.* This result makes perfect sense, given that Congressional intent is the "ultimate touchstone" of any preemption analysis. *Medtronic,* 518 U.S. at 494, 116 S.Ct. 2240.

There are equally compelling policy justifications for reading *Bartlett* and *Mensing* narrowly so as to preserve the viability of products liability actions. As the Court recognized in *Wyeth,* state-law tort suits play an important "complementary" role to federal drug regulation. *See* 555 U.S. at 578, 129 S.Ct. 1187. The FDA has limited resources, which constrain its ability to police the drug market and protect the public. *See id.* at 579, 129 S.Ct. 1187. "State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons to come forward with information." *Id.; accord Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 451, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (finding that torts suits serve as a "catalyst" for identifying new drug dangers). Moreover, because the FDCA does not create a private right of action,[11] products liability

suits provide injured consumers like Plaintiff with an important remedy not available under federal law. *Bartlett,* 133 S.Ct. at 2485 (Sotomayor, J., dissenting).

## CONCLUSION

Congressional intent to preserve products liability actions against manufacturers of nonprescription drugs could not be more clear. This intent is divined simply by examining the governing legislation, which contains an express non-preemption clause. Accordingly, and for the reasons previously stated, the Court finds Defendants have failed to carry their heavy burden of demonstrating preemption.

---

10. At least one court of appeal appears to have arrived as the same conclusion. In *Drager v. PLIVA USA, Inc.,* the Fourth Circuit stated that it is unnecessary to undertake the conflict preemption analysis if the federal statute "expressly preempts or expressly pre-

serves otherwise applicable state law duties." 741 F.3d 470, 475 (4th Cir.2014).

11. *See* 21 U.S.C. § 337(a); *IQ Prods. Co. v. Pennzoil Prods. Co.,* 305 F.3d 368, 374 (5th Cir.2002).